# The Law Office of David S. Hammer

500 Fifth Ave., 34th Fl. ● New York, New York 10110 ● (212) 941-8118 ● Fax: (212) 764-3701

November 27, 2018

**BY ECF and E-Mail**

Hon. Deborah A. Batts
United States District Judge
Southern District of New York
500 Pearl Street, Courtroom 24B
New York, NY 10007

    Re:    <u>Benthos v. Etra and Evans, Case No. 18-cf-9401 (DAB)</u>

Dear Judge Batts:

    I write in response to the letter that Stephen Popofsky, Esq. filed yesterday on behalf of Petitioner Benthos (the "Popofsky Letter"). In this highly intemperate letter, Mr. Popofsky repeatedly accuses Aaron Etra of belonging to an international conspiracy of criminals, bound together by the hope of stealing Benthos's money. Based on this accusation, Mr. Popofsky demands that the "co-conspirator" Etra be required to meet a new set of expensive and onerous obligations, obligations not previously contemplated by any court order of this Court. This in spite of the fact that Mr. Etra – a 77-year-old lawyer with no criminal history -- was merely an escrow agent in the Bitcoin Transaction, has never been found by any court to have breached the escrow agreement, and has now fully complied with all directives issued by Your Honor in the present action.

    At the outset, I note that Mr. Popofsky makes one contention that is correct: I did not file a memorandum of law to accompany my declaration opposing Petitioner's motion for contempt, although such a memorandum is required by Local Rule 7.1(a)(2). This, however, was not a willful violation of court rules. I do not specialize in federal civil litigation, and until I read the Popofsky Letter, I did not even know Rule 7.1 existed. Moreover, as Mr. Popofsky acknowledges, I only was retained in this case last Friday November 23, 2018, **and barely had sufficient time to learn the basic facts, read the emails I was to produce and draft a declaration in opposition by the deadline of Monday November 26, 2018. The simultaneous preparation of a coherent memorandum of law would have been beyond my powers.**

    This point conceded, it is highly unlikely that Benthos was prejudiced by my failure to submit a legal memorandum. My declaration almost entirely was devoted to a discussion of the facts, more precisely, to establishing that: (1) as of November 26, 2018, Mr. Etra had fully

1

complied with this Court's outstanding orders, and (2) Mr. Etra had made no misrepresentations to the Court during the November 15th Hearing.  The only propositions of law I advanced were that: (i) any communications between Mr. Etra and Benthos following the commencement of the present proceeding were permissible under Rule 4.2(c) of New York's Rules of Professional Responsibility, and (ii) those communications in any event were not made in the presence of the Court and thus could not justify sanctions under 28 U.S.C. § 401.  See, Hammer Declaration ¶¶s22-23.

      For these reasons, I respectfully ask Your Honor to exercise Your authority under Local Rule 7.1 and excuse the failure to accompany my declaration with a memorandum of law.  However, if Your Honor feels such a memorandum is necessary, I quickly will provide one.

      The remainder of the Popofsky Letter consists of a ferocious diatribe against the "co-conspirator" Aaron Etra.  Stripped of the incendiary language and accusations, the Letter makes the following claims:

      1.    Mr. Popofsky's first complaint is that I did not submit an affidavit by Mr. Etra "swearing that he has produced all the ordered correspondence". (Popofsky Letter at 1).  I should have done so, according to Mr. Popofsky, because his client's motion for contempt had asked for such a certification.  Your Honor will appreciate, however, that my purpose on entering this case was to ensure that Aaron Etra was in compliance with all orders of the Court, not with all demands by Mr. Popofsky.  The Court did not order Mr. Etra to produce the affidavit Benthos now demands, and I saw no reason to have him to do so.

      2.    Mr. Popofsky notes that the majority of the emails we produced were written before October 15, 2018, when this action commenced.  This is hardly surprising since by October 15th Mr. Etra had completed the tasks he was obligated to perform under his escrow agreement.  One would expect his communications as an escrow agent to diminish at that point.  Moreover, as I informed Mr. Popofsky, there *is* an additional corpus of emails for the post-October period, emails that concern the search for a new buyer, that is, a buyer willing to tender an additional $850,000 to meet the minimum payment of $5,850,000 required to release the bitcoins that Benthos seeks (the "Supplementary Buyer Emails").  Mr. Etra has withheld producing those emails on the ground that they fall outside the Court's October 15th Order, a point Benthos predictably disputes.

      That Benthos should seek production of the Supplementary Buyer Emails is unremarkable.  What is less easy to understand is Mr. Popofsky's insinuation that we are withholding them as part of some criminal scheme to defraud Benthos. In the words of the Popofsky Letter: "Etra, a New York lawyer, a fiduciary and an Escrow Agent, continues to hide something or protect someone (or both)". (Popofsky Letter at 5).  Since we notified Mr. Popofsky that the emails exist, this accusation makes no sense.

      3.    Mr. Popofsky complains that "Etra's new lawyer" (by which I assume he means me) has produced only photocopies of printouts of emails rather than "an electronic production with megadata" (Popofsky Letter 3).  But this Court's October 15th Order did not require "an electronic production with megadata", and Mr. Popofsky himself did not request such a production until he filed the Popofsky Letter.  By making this demand, Mr. Popofsky has effectively filed a new motion; he has not, however, provided any grounds to support his new

motion, except for the fact that he and his client would prefer an electronic production.

4. Mr. Popofsky states that it is "entirely unclear" whether Mr. Etra is withholding documents under a claim of privilege or priva[cy]". Mr. Etra makes no such claim. Rather, the ground on which he withheld the "Supplementary Buyer Emails" is that they fall outside the terms of this Court's October 15th Order.[1] And although Mr. Popofsky calls this contention "nonsensical", he does not support that characterization with any real analysis of the terms of the October 15th Order, insisting instead that the point is "self-evident". (Popofsky Letter at 5).

The point is not self-evident. The Court may recall that its October 15th Order directed Mr. Etra to provide all communications between and among the participants in the Bitcoin Transaction to the extent those communications concerned "the Bitcoin Agreement, the Escrow Agreement and/or the funds deposited by Benthos into Etra's IOLA account". This excludes the Supplementary Buyer Emails: neither the Bitcoin Agreement nor the Escrow Agreement contemplate a supplementary buyer, and the money Benthos deposited in Mr. Etra's IOLA account pertained to Benthos's role alone; any supplementary buyer, by definition, would have to provide new money, tendered under a new escrow agreement.

A natural reading of the October 15th Order therefore is that it addresses the existing agreements between the parties and the funds already escrowed. Under that reading, the Order does *not* address agreements that may come into the existence at some point in the future, such as agreements pertaining to a supplementary buyer. Put otherwise, since the Supplementary Buyer Emails all concern an attempt to find a new buyer who will be subject to new agreements, and required to tender new funds, those emails do not fall within the terms of the October 15th Order.

Finally, the *purpose* of the October 15th Order is not served by requiring production of the Supplementary Buyer Emails. Here, I respectfully remind the Court that the present action has a very limited goal: to aid a future arbitration by preserving funds and evidence associated with the Bitcoin Transaction. This point was made by Benthos itself, in the Petition that Mr. Popofsky originally filed in commencing this action. That petition explicitly asserted that an injunction was necessary for two reasons:

> (1) to restrain further disbursements or transfers of the $5 million Petitioner previously deposited into escrow, and (ii) to obtain information about the flow of money and the identities of the individuals and entities who have not only breached their contractual obligations but appear to have engaged in a fraudulent scheme to steal and abscond with Petitioner's money.

Petition for Preliminary Injunctive Relief In Aid of Arbitration at 2.

---

[1] I should note that I have not personally seen the Supplementary Buyer Emails: I agreed to withhold their production on the basis of Mr. Etra's description of their contents. I accepted this description without requiring my personal inspection because of the time pressure I was under in responding to Benthos's motion for contempt. However, Mr. Etra – who is out-of-town through this Friday – has agreed to deliver the Supplementary Buyer Emails to my home this weekend. I will undertake to assess them as quickly as possible, and then to communicate my assessment to counsel and the Court. At that point, Your Honor may make whatever determination and order Your Honor finds appropriate.

The emails produced are pertinent to the purposes for which this action commenced. The Supplementary Buyer emails are not. We therefore submit that production of the Supplementary Buyer Emails was not required by the October 15th emails is correct.

### Conclusion

In the period since the November 15th Hearing, the original purposes for which this action was commenced all have been satisfied. Mr. Etra has refunded to Benthos all money remaining from Petitioner's original deposit and has submitted all the communications in his possession that concern and evidence "the flow of money and the identifies of the individuals and entities" in the Bitcoin Transaction. Having brought himself into compliance with the Court's orders, Mr. Etra had reason to expect that Benthos would respond in a positive manner. That expectation proved naïve. Benthos has responded to Mr. Etra's efforts with a letter that denounces him as a criminal and demands that the Court direct him to comply with an entirely new set of intrusive and expensive demands.

At this point, it seems clear that Benthos no longer is attempting to obtain information in aid of a future arbitration but is instead using this action to pressure Mr. Etra into making some concession or settlement he would not otherwise make. We respectfully submit that this is a misuse of the extraordinary procedures authorized by CPLR 7502(c). If Benthos has a claim against Mr. Etra, it should initiate arbitration. But it should not be permitted to use the present action as a means of evading the normal obligation to prove its case – that is, to prove that Aaron Etra breached his contractual duties under the Escrow Agreement.[2]

In view of the foregoing considerations, we respectfully ask the Court to defer ruling on whether the Supplementary Buyer Emails must be produced until I have time to read and file an assessment. Once the Court issues a ruling on the issue, and performance with the terms of that ruling are complete, I urge the Court to terminate the present action, and refer Benthos to its remedies at arbitration.

Very truly yours,

*David S. Hammer*

David S. Hammer

---

[2] We also ask that before the Court consider imposing new obligations on Mr. Etra, it require Benthos to disclose what efforts it has made to make itself whole, e.g., efforts to trace the escrowed funds after their release.