

*Direct Dial: 212.880.9882*
*E-Mail: spopofsky@kkwc.com*

December 4, 2018

**BY ECF**

Hon. Deborah A. Batts
United States District Judge
Southern District of New York
500 Pearl Street, Courtroom 24B
New York, NY 10007

 **Re:  Benthos v. Etra and Evans, Case No. 18-cv-9401 (DAB)**

Dear Judge Batts:

On behalf of Petitioner Benthos, I respectfully submit this letter in accordance with the Court's Order dated November 29, 2018 (Dkt. #23); in response to the letter from respondent Etra's lawyer dated November 27, 2018; and in furtherance of Benthos's petition in aid of arbitration as well as its motion for contempt.

There are four categories of documents that we reasonably believe exist, but have not been produced, such that Etra is not in compliance with the Court's October 19, 2018 Order requiring production of:

> "all communications between and among any of [himself], Valkyrie Group LLC, Valhalla Venture Group LLC, Brandon Austin, Hugh Austin, Tracy Evans, 'Dmitri,' and Ming Hoang Le, or any of their affiliates, representatives and/or agents, concerning the Bitcoin Agreement, the Escrow Agreement, and/or the funds deposited by Benthos into [his] lOLA account."

Because there is uncertainty, and because Etra's credibility is zero (and because his lawyer admittedly has no personal knowledge), we have asked for (i) production of e-mails to be made electronically (where metadata can be examined), rather than through printouts of claimed e-mails; (ii) a forensic examination of Etra's computer(s) and phone(s), to verify whether there is additional correspondence to stated individuals that has not been produced; and (iii) a deposition of Etra (in connection with but also independent of the contempt motion), to address the document issues <u>and</u> other issues – further addressed below – raised by the petition in aid of arbitration. In addition, we have requested (iv) reimbursement of Benthos's reasonable legal



Hon. Deborah A. Batts
December 4, 2018
Page 2

costs incurred as a result of Etra's <u>undenied</u> repeated violation of his fiduciary responsibilities to provide information and documents to Benthos (first requested August 31, 2018 and requested again September 28, 2018) and his <u>undeniable</u> violation of the Court's October 19, 2018 Order. All of that will be addressed in turn below.

The first category of e-mails Etra most certainly has failed to produce consists of correspondence related to the inception of the parties' relationship and the formation of the Bitcoin Agreement and Escrow Agreement pursuant to which the $5 million was sent to Etra. This would include (a) the drafting of the contract documents (who prepared them?); (b) negotiation of the contract documents (Hugh Austin told petitioner that he made "final edits with Aaron [Etra] and Tracy [Evans]," but Etra has produced nothing of that nature); (c) how the parties came to be involved with each other for this transaction and how Etra came to be introduced to petitioner as a supposedly reputable escrow agent (Etra did not simply materialize out of thin air but we have no idea how his participation came about); and (d) the respective roles and involvement of Tracy Evans, "Dmitri Kaslov" and Minh Hoang Le in the Bitcoin transaction at its inception, including any e-mails reflecting Etra's purported authority to wire $4,600,000 of petitioner's funds out of his escrow account on the instructions of Kaslov (if such an individual exists), who was neither a party to the Bitcoin Agreement nor an agent of petitioner's counterparties. Etra has produced none of that.

The second category – further seemingly missing documents – consists of everything related to all the supposed intensive efforts purportedly undertaken by Etra and others to consummate the transaction for which he took $5 million into escrow, particularly after October 15, 2018 when they were served with Judge Castel's Order. After that date, notwithstanding that petitioner had unequivocally terminated the contract and demanded return of its money in full, respondents continued to assure petitioner and its counsel that, for example, Etra was "still working" on "consummating the transaction"; that things were "moving" and Etra had located "three buyers" to consummate the transaction; and that "[t]here has been a lot of positive activity during the past weeks that is finally happening. . . . If we can deliver the [Bitcoin] . . . would that work for you to complete the transaction?" As late as the court appearance on November 15, Etra approached the undersigned outside of court and said that the transaction was imminent if Benthos wished to conclude it, the umpeenth time he or his counsel has made that statement. With all of that supposedly going on, where is the accompanying e-mail traffic?

The third category consists of communications between Etra and his confederates (Evans, Minh Hoang Le, Dmitri Kaslov, and Brandon and Hugh Austin) concerning the court orders and court case that commenced October 15. Etra has produced one single solitary e-mail in that regard, and that e-mail (from Ming Hoang Le) expressly references prior discussions ("Good to see your update, It was so sad to know what you [Evans] and Aaron [Etra] are going through at this moment with the Lawyers and the Court"), but Etra did not produce the "update" that was

**KLEINBERG
KAPLAN**

Hon. Deborah A. Batts
December 4, 2018
Page 3

"good to see," and it is inconceivable that Etra and Evans, and the others, did not have extensive correspondence (or at least some correspondence) regarding being haled into court and ordered to produce documents and information.

The fourth category is what Etra's lawyer admitted his client has withheld: "Supplementary Buyer Emails" that "concern the search for a new buyer, that is, a buyer willing to tender an additional $850,000 to meet the [new and non-contractual] minimum payment of $5,850,000 [now supposedly] required to release the bitcoins." I respectfully repeat that it is self-evident that that correspondence "concern[s] the Bitcoin Agreement, the Escrow Agreement, and/or the funds deposited by Benthos into [Etra's] IOLA account," because – as Mr. Hammer's letter itself demonstrates – Etra and his confederates are claiming that they need a "Supplementary Buyer" in order to consummate "the Bitcoin Agreement" in connection with "the funds deposited by Benthos," which funds would, purportedly, be used (with the mysterious additional $850,000) to obtain the Bitcoin for which the parties contracted.

<u>We are in danger here of missing the forest for the trees</u>:

*Where is Benthos's $4.6 million? If, as Etra claims, an "additional" $850,000 is "required to release the bitcoins," since Benthos has terminated the contract (by its terms) and requested return of its funds, why have the funds not been returned? Who has them? What efforts have been made to obtain and return them?[1] If no efforts have been made, why not? Why did Etra disburse money from escrow on instructions from Dmitri Kaslov when the Escrow Agreement required him to take instructions only from the contracting parties? Why did Etra send Benthos's money to Hong Kong? Who is in charge of that account? What has happened to those monies since the August transfers? Why did Etra affirmatively conceal where he sent the money, and all other basic information about the funds entrusted to him, when asked on August 31? Why did he continue to conceal all that when asked again on September 28? Why did he stay silent after the October 19 court order? Why did he refuse (until threatened with jail in court on November 15) to return the $400,000 that he was holding all along, after its return had been demanded when Benthos terminated the transaction on October 12? Where is the Bitcoin? Is there really any Bitcoin at all? Why is an additional $850,000 required to settle a contract for $5 million? <u>What in the world is going on here?</u>*

And where is the correspondence surrounding everything addressed in the above paragraph?

---

[1] The undersigned posed that precise question to Etra's lawyer on November 28. He has deliberately refused to answer. The inference is clear that neither Etra nor anyone else has made any such efforts, having devoted their efforts rather to absconding with Benthos's funds and stalling and obstructing our attempts to track the money and find out what happened.



Hon. Deborah A. Batts
December 4, 2018
Page 4

Etra knows all of those answers.  He is not telling.  We are still in the dark about Etra's pre-contractual and post-August dealings with (and relationship with) those who appear to have stolen – with Etra's connivance or knowing assistance – petitioner's money.  His minimal non-electronic production to his unknowing lawyer simply cannot be trusted, and in any event is woefully insufficient to provide information in aid of arbitration.[2]  The only way to find out anything is a conditional contempt order, a forensic examination, and a deposition – not only to purge his contempt, but also simply in aid of arbitration – at which he cannot duck questions as he is now doing through his new and admittedly uninformed lawyer.

Finally, counsel's letter adopts an air of injured innocence on his client's behalf ( "a 77-year-old lawyer with no criminal history [and] merely an escrow agent").  He is not "merely an escrow agent" – if he were, he would have answered the questions on August 31, and on September 28, and he would have complied with the court's Order of October 19.  To the contrary, he has been actively involved in this every step of the way (and a "mere" escrow agent does not demand a fee of $50,000 to receive funds and transfer them a few days later).  While "no criminal history" may be literally accurate, Etra in fact has been found previously to have improperly disbursed money out of escrow, to "a friend of [his]" no less (not unlike what appears may have happened here) "who profited illegally from that transaction."  *Grasshoff v. Etra*, Index No. 650832/2012 at Dkt. 78 (Sup. Ct. N.Y. Co. Oct. 21, 2014) (granting summary judgment on conversion claim), aff'd, 135 A.D.3d 574 (1st Dep't 2016), annexed hereto as Exhibits A and B respectively.

---

[2] Indeed, as this letter was being finalized, Etra's lawyer notified us yesterday that his client has now provided him with additional "emails and attachments that were not included in the set of materials I provided to you last week," and that counsel intends to review them and produce those that "in my judgment are covered by the October 15th order."  Of course, counsel previously had represented to this Court (without personal knowledge) that Etra "has now fully complied with all directives issued by Your Honor in the present action" (Dkt. 22 at 1). That representation is now exposed, not surprisingly, as false. It is manifest that Etra is picking and choosing what (non-incriminating) correspondence to produce; that he became concerned after our November 27 letter as to what the Court might order next; that he therefore decided to come up with some additional documents; that he is continuing to cabin his production primarily to the non-controversial August timeframe (when the parties were working together), while continuing to conceal how the contract came about and what happened after the contractual consideration was not provided and Benthos started asking questions about the money. Benthos should not be forced at this juncture to trust Etra and wait for what other breadcrumbs he may drop.



Hon. Deborah A. Batts
December 4, 2018
Page 5


    Accordingly, we reiterate our request for the relief sought in my November 27 letter.
Thank you.


                                            Respectfully yours,

                                            *[signature]*

                                            Steven R. Popofsky


cc:    All Parties (by ecf and e-mail)

# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: IAS PART 3
-------------------------------------------------------------------------x
SVEN GRASSHOFF,

                                        Plaintiff,

                    -against-                              Index No. 650832/2012
                                                          Motion Date: 10/9/2014
                                                          Motion Seq. No.: 003
AARON ETRA,

                                        Defendant.
-------------------------------------------------------------------------x

The following papers, numbered 1 to 2, were read on this motion to dismiss.

|  | Papers Numbered |
|---|---|
| Notice of Motion/Order to Show Cause - Affidavits - Exhibits | 1 |
| Answering Affidavits - Exhibits | 2 |
| Replying Affidavits | 3 |
| Cross-Motion: x Yes   ☐  No | |

        This matter comes before the Court on the parties' cross-motions for
summary judgment. Plaintiff Sven Grasshoff seeks summary judgment on his
conversion claim, while Defendant Aaron Etra seeks summary judgment,
dismissing all counts in the Complaint.  For the reasons stated on the
September 15, 2014 record (Bonnie Piccirillo, OCR) and as set forth below,
Plaintiff's summary judgment motion is granted, while Defendant's motion is
denied.

        Under New York law, "[a] conversion occurs when a party, intentionally
and without authority, assumes or exercises control over personal property
belonging to someone else, interfering with that person's right of possession."
*Lynch v. City of New York*, 108 A.D.3d 94, 101 (1st Dep't 2013). "Two key
elements of conversion are (1) the plaintiff's possessory right or interest in the
property and (2) the defendant's dominion over the property or interference
with it, in derogation of plaintiff's rights." *Lynch*, 108 A.D.3d at 101.    Here, it
is undisputed that Etra forwarded Grasshoff's funds from the Citibank escrow
account to Hunter.  Etra's only argument in opposition is that he had no
contractual obligation to hold on to the funds, since he never signed the
Deposit Agreement. However, the existence of a contractual obligation is not
a prerequisite to a conversion claim.  Since Plaintiff has demonstrated its

*Grasshoff v. Etra*                                      Index No. 650832/2012
                                                              Page 2 of 3

prima facie entitlement to summary judgment by establishing the absence of
any material issues of fact, the burden shifts to the party opposing the motion
to produce evidentiary proof, in admissible form, sufficient to establish the
existence of material issues of fact which require a trial of the action.
*Zuckerman v. City of New York*, 49 N.Y.2d 557, 562 (1980). Defendant has
made no such factual showing relevant to the conversion claim. Accordingly,
Plaintiff's motion for summary judgment is granted.

Defendant's cross-motion for summary judgment is a verbatim
cut-and-paste copy of the argument made in his motion to dismiss. This
motion was denied by the Court, and this denial was affirmed by the First
Department. *See Grasshoff v. Etra*, 114 A.D.3d 429 (1st Dep't 2014). In his
papers, as in the previous motion, Etra cites to a Court of Appeals case,
*Shapiro v. McNeil*, 92 N.Y.2d 91 (1998). Etra argues that all claims asserted
against him in the Complaint fail because under *Shapiro*, he owed no duty of
care to Grasshoff. This argument was rejected by the Court in the motion to
dismiss, since Plaintiff's conversion, breach of contract, and promissory
estoppel claims do not require a showing of duty owed by Etra to Plaintiff.

While Plaintiff's breach of fiduciary duty and negligent misrepresentation
claims require a showing of duty, the Court noted Plaintiff's pleading that Etra
had a contractual duty to serve as Paymaster. While Etra now disputes
whether that contractual duty, in fact, exists, this issue is a factual dispute.
Thus, Etra's argument that the Deposit Agreement is a forgery does not
provide a basis upon which to grant summary judgment.

Accordingly, it is

ORDERED that Plaintiff's motion for summary judgment is granted to the
extent of granting summary judgment in favor of Plaintiff and against
Defendant as follows:

1.  Plaintiff is granted judgment on its fifth cause of action for
    conversion in the amount of $150,000, together with interest at the
    rate of 9% per annum, from the date of September 22, 2011 until
    the date of the decision on this motion, and thereafter at the
    statutory rate, as calculated by the Clerk, together with costs and
    disbursements to be taxed by the Clerk upon submission of an

*Grasshoff v. Etra*                                          Index No. 650832/2012
                                                                   Page 3 of 3

appropriate bill of costs, the fifth cause of action is severed, and the Clerk is directed to enter judgment accordingly; and it is further

ORDERED that the action shall continue as to the first through fourth causes of action; and it is further

ORDERED that counsel are directed to appear for a pretrial conference in Room 442 on December 9, 2014 at 10 a.m.

Dated: October 14, 2014

**Hon. Eileen Bransten**

1. CHECK ONE: ..........................................☐ CASE DISPOSED                  X NON-FINAL DISPOSITION

2. CHECK AS APPROPRIATE: Motion is: X GRANTED   ☐ DENIED   ☐ GRANTED IN PART   ☐ OTHER

3. CHECK IF APPROPRIATE: ....................☐ SETTLE ORDER                  ☐ SUBMIT ORDER

                                        ☐ DO NOT POST  ☐ FIDUCIARY APPOINTMENT  ☐ REFERENCE

1

1

2  SUPREME COURT OF THE STATE OF NEW YORK
   COUNTY OF NEW YORK: TRIAL TERM PART 3
3  - - - - - - - - - - - - - - - - - - - - X

4  SVEN GRASSHOFF,

5                              Plaintiff,
                                            INDEX NO.
6           - against -                     650832/12

7  AARON ETRA,

8                              Defendant.

9  - - - - - - - - - - - - - - - - - - - - X
                       60 Centre Street
10                     New York, New York
                       September 15, 2014
11                     PROCEEDINGS

12
   BEFORE:
13
              HONORABLE EILEEN BRANSTEN,
14                                    Justice

15
   APPEARANCES:
16
       LAX & NEVILLE LLP
17     Attorneys for the Plaintiff
       1450 Broadway, 35th Floor
18     New York, New York   10018
       BY:   RAQUEL TERRIGNO, ESQ.
19

20     WILLIAM M. PINZLER, ESQ.
       Attorney for the Defendant
21     488 Madison Avenue, Suite 1100
       New York, New York   10022-5720
22

23

24                    Bonnie Piccirillo
                      Official Court Reporter
25

26


          Bonnie Piccirillo - Official Court Reporter

1          Proceedings

2                THE COURT:  Okay, for the plaintiff, Grasshoff, I

3          have from Lax & Neville LLP firm, Raquel Terrigno.

4                MS. TERRIGNO:  Raquel Terrigno.

5                THE COURT:  For the defendant, Aaron Etra, I have

6          William Pinzler.

7                MR. PINZLER:  Yes, ma'am.

8                THE COURT:  All right, without a doubt, we all can

9          agree t hat Mr. Grasshoff did send to a bank account that's

10         named Indeva - spell that for the record.

11               MR. PINZLER:  I-N-D-E-V-A.

12               THE COURT:  The sum of $150,000.  According to

13         Mr. Grasshoff, he did so after signing a document, a

14         document that's in the papers here in which it was agreed

15         that the money would be held in escrow.  And, in fact, this

16         is a quote:

17               "Upon receipt of Grasshoff's payment, upon receipt

18         of payment of $150,000 which transaction was 07519936, ate

19         shall hold Grasshoff's deposit in escrow; shall release

20         said funds only upon closing of transaction number 07519936

21         or on or before September 30, 2011."

22               Also another section of it:

23               "In the event that the transaction failed to close

24         on or before September 30, 2011, the deposit agreement

25         provided that Etra, quote, shall not release or pay said

26         funds to anyone other than Grasshoff and shall immediately

1                          Proceedings
2      wire said funds back to Grasshoff."
3              Now, Mr. Pinzler, you coming up with this concept
4      that this agreement, which is signed by somebody, saying
5      that there was a forgery.
6              MR. PINZLER:  Yes.
7              THE COURT:  Right.
8              MR. PINZLER:  Yes.
9              THE COURT:  What proof have you given this Court
10     that it was a forgery?
11             MR. PINZLER:  Mr. Etra submitted an affidavit --
12             THE COURT:  That's nothing.  I could say it's a
13     forgery, too.  It's my signature, I say it's a forgery.
14             What proof have you given this Court upon from a
15     self-serving statement of the man who, after all, is being
16     asked to -- is being charged with conversion, what other
17     proof have you given this Court?
18             MR. PINZLER:  Your Honor, I submit to you that
19     there is no other proof I could give.
20             THE COURT:  Yes, you can.  You can get yourself a
21     forgery expert.  You can get yourself a handwriting expert.
22     You could do a lot of things to try to prove to me that
23     indeed it's not Etra's signature.  And the fact that he
24     says to me in a statement that, Gee, it's not my signature,
25     therefore, though I say in my deposition and I say other
26     places it was a mistake the money being sent to me, a

1   Proceedings

2   mistake. Instead of sending it back to the person who made

3   the mistake, you send it on to somebody else who profits.

4       Now, you tell me what is wrong with saying that's

5   a conversion?

6       MR. PINZLER: First, given that these are

7   cross-motions for summary judgment, if what you've just

8   said is correct, the testimony of the people who would give

9   affidavits or testimony or the like would occur at a trial.

10  So --

11      THE COURT: Not if we have conclusive proof.

12  Summary judgment is in lieu of a trial, and it has to be

13  based on something that indeed is something that could be

14  relied on as proof worthy.

15      In other words, I do not consider Mr. Etra's

16  statement -- I don't care if it is an affidavit -- to be

17  proof worthy because it is self-serving.

18      So, as a result of that self-serving statement,

19  you have not provided me an iota of additional proof of any

20  proof whatsoever. We have Mr. Etra saying in his papers,

21  Oh, yes, I know it was a mistake sending me this money, but

22  instead of returning it to the money who made the mistake

23  which was Mr. Grasshoff, he sends it on to the person who

24  the money was supposed to be held depending on whether or

25  not the transaction went through.

26      That doesn't seem good.

Bonnie Piccirillo - Official Court Reporter

1                          Proceedings

2              MR. PINZLER:  May I respond?

3              THE COURT:  Yes.

4              MR. PINZLER:  First, Etra's position is he didn't

5    sign it so he didn't know about whatever the conditions

6    are --

7              THE COURT:  It was a mistake, that he says.

8              MR. PINZLER:  Let me.  The second, the second

9    position, the position on which Ms. Terrigno and I do agree

10   which is that irrespective of how Grasshoff came to do it,

11   Grasshoff sends Etra $150,000.  There is equally no

12   question that upon receiving a phone call from someone not

13   Grasshoff, Etra sends the money on.

14             Those facts are not in dispute, irrespective of

15   what's in the agreement, which Etra didn't sign.

16             THE COURT:  Well, you know, which Etra says he

17   didn't sign because there's nothing to prove to me that he

18   didn't sign it.  There's absolutely not an iota of proof.

19             I mean, look, something comes up and I say, Gee, I

20   didn't sign that; doesn't mean that in fact I did not sign

21   it.  It's just to my convenience that I say it wasn't

22   signed, my convenience; but there's no proof that he didn't

23   sign it.  You have provided nothing, nothing in support,

24   nothing, nothing.

25             MR. PINZLER:  If that is the issue on which you

26   wish to focus, I suggest that the case can be decided

1          Proceedings

2   without resolving that issue.

3          THE COURT:  Oh, no, it can't because if indeed I

4   take -- because if I find in fact that Grasshoff has

5   provided evidentiary proof that he -- also says he signed

6   the document -- okay, you say he didn't but he says he did

7   -- and that document was to hold $150,000 in escrow in this

8   lawyer's escrow account, mind you he's a lawyer, Mr. Etra

9   so that puts a further burden on him.  He's a lawyer, and

10  that was to be held until an arrangement was made for the

11  investment.

12         Instead of which the money comes into the account,

13  and then merely comes and it goes to the person who is the

14  profit-er of the money, of this transaction.

15         MR. PINZLER:  Your Honor, if Mr. Etra had signed

16  the document, we would not be here because --

17         THE COURT:  Why not?

18         MR. PINZLER:  Because there would be no defense

19  that Mr. Etra had to his actions.  In fact, Mr. Etra's

20  position --

21         THE COURT:  Again, I'm asking you what proof do

22  you have of that?

23         MR. PINZLER:  We have not produced any proof.  We

24  do not have an expert, although one would be produced if

25  there was a trial.  In fact, we don't have an original

26  signature on the form itself.  However, if there were a

1                                Proceedings

2     trial, there would be an expert and your Honor would be

3     able to decide whether or not Mr. Etra had signed the

4     document or not signed the document.

5           However --

6           THE COURT: You know, but the other thing is let's

7     just say for a second that you get beyond the fact that

8     money was sent and that it was sent on to the person that

9     benefitted with the money being sent frankly illegally to

10     that person; how can you get around this statement by your

11     client? Mr. Etra says, Oh, I knew that Mr. Grasshoff or

12     however I got this money, it was a mistake.

13           Now, if you make a mistake, sir, do you then send

14     it to the person who is going to profit from it, or do you

15     say, Gee, it was a mistake that money came into my bank

16     account, I have to return it to the person who sent it to

17     me? Not to the person who is a friend of Mr. Etra and who

18     profited illegally from that transaction.

19           If you have a mistake, what do you do about it?

20           MR. PINZLER: It is our position that the question

21     before the Court is only whether having received the money

22     without any identification, without any indication from

23     whence it came, that Mr. Etra passing it on, the only

24     question is did Mr. Etra have a duty to inquire?

25           We suggest that the Shapiro case --

26           THE COURT: In a conversion case there's no duty.

1                           Proceedings

2    All right, there's no need for a duty.

3              That, by the way, was the same argument you made

4    in your motion to dismiss.  It was a motion then that you

5    made that same argument to the Appellate Division.  I

6    handled it in my decision.  It went up to the Appellate

7    Division, and guess what?  They affirmed me and the

8    argument that you made pursuant to that one case that he

9    had no duty -- in this case there was conversion, there's

10   no duty necessary.  Absolutely the issue of duty does not

11   occur.

12             It's a simple -- a conversion occurs when a party

13   intentionally and without authority assumes or exercises

14   control over personal property belonging to somebody else,

15   interfering with that person's right of possession and that

16   goes to Lynch versus the City of New York, 108 AD3d 904 at

17   page 101, First Department 2013.

18             Quote:  "Two key elements of conversion are:"

19             "One, the plaintiff's possessory right or interest

20   in the property."

21             Definitely was his 150,000 that he sent, okay so

22   we got that.

23             And, "two, the defendant's dominion over the

24   property or interference with it in derogation of

25   plaintiff's rights."

26             So even under Mr. Etra who trade point of vie and

                Bonnie Piccirillo - Official Court Reporter

1                                Proceedings

2      that again goes to Lynch at 101, you tray point of view

3      that, Gee, whoever sent me this money did so under a

4      mistake so therefore, of course, I have the right, I have

5      no duty, I can give it to Mr. Hudson.

6                Without a doubt, one thing that Mr. Etra had was

7      an escrow account into which moneys appeared, mistake, not

8      mistake, pursuant to a contract or not pursuant to a

9      contract.

10               Once the money has appeared in Mr. Etra's bank

11     account, under Mr. Etra's theory of life, it was a mistake

12     that it arrived, a mistake.  If somebody makes an error or

13     if somebody makes a mistake, then what you have to do as an

14     attorney admitted to practice law in the State of New York

15     under our comprehensive rules of ethics and everything

16     else, I've got to do everything I can to rectify the

17     mistake, to send the money back to its original source.

18     And even if my name has been forged and et cetera, et

19     cetera, which there's no proof of that whatsoever.

20     Nevertheless, a mistake gives a duty particularly to an

21     attorney, and particularly a member of my bar, and

22     particularly a person who has an escrow fund into which the

23     mistake appeared to do whatever is necessary to find out

24     who this money belongs to and to contact that person,

25     return the money and do whatever.  But, not to take the

26     money that appeared by mistake, by mistake and then send it

1        Proceedings

2    on to my friend, Mr. Hudson, to Mr. Grasshoff's 100 percent

3    detriment because Mr. Hudson never returned it.

4        MR. PINZLER:  Just one comment.  While it is true

5    that Mr. Etra is and remains an attorney, the money was not

6    sent to his attorney escrow account, but rather was sent to

7    an account at the Indeva Corporation.

8        THE COURT:  Which he controlled.

9        MR. PINZLER:  No question.  I just wanted to make

10   the distinction between the escrow account and the account

11   that Mr. Etra controlled.  We don't dispute that the

12   Mr. Etra controlled the account or he's an attorney, but it

13   wasn't his escrow account.  The standards may be the same,

14   but I wanted to clarify that fine point.

15       THE COURT:  I have a question for Mr. Terrigno,

16   and that is you sued for summary judgment on conversion

17   only?

18       MS. TERRIGNO:  Correct, your Honor.

19       THE COURT:  Let's assume I grant you that.  What

20   happens to the other four causes of action that you never

21   did anything about?

22       MS. TERRIGNO:  We didn't move for summary judgment

23   on them because there was an issue of fact as to whether

24   Mr. Etra signed the contract or not, and conversion doesn't

25   require a signed contract and so that's why we moved for

26   summary judgment on that one in particular.

11

```
 1                          Proceedings
 2                 THE COURT:  All right.
 3                 Anything else?
 4                 MS. TERRIGNO:  Nothing further from plaintiff,
 5      your Honor.
 6                 MR. PINZLER:  Nothing.
 7                 THE COURT:  Did I send you to -- I think I did.  I
 8      sent you to ADR, didn't I?
 9                 MR. PINZLER:  Yes.  Unfortunately, unsuccessful.
10                 MS. TERRIGNO:  You did, your Honor.
11                 THE COURT:  Well, all right, so what I want is a
12      copy of the minutes.  I'll give you a gray sheet when I get
13      a copy of the minutes.
14                 I am going to grant the conversion.
15                 Make sure I get a copy of the minutes because I
16      won't write you a single word.
17                 MR. PINZLER:  We've done this before, your Honor.
18                 THE COURT:  All right, thank you very much.  I
19      hope everybody has a good day.
20
21                          ---
22
23                   CERTIFIED TO BE A TRUE
24                   AND CORRECT TRANSCRIPT
25
26                   BONNIE PICCIRILLO
                     OFFICIAL COURT REPORTER
```

1

**$**

$150,000 [4] - 2:12, 2:18, 5:11, 6:7

**0**

07519936 [2] - 2:18, 2:20

**1**

100 [1] - 10:2
10018 [1] - 1:18
10022-5720 [1] - 1:21
101 [2] - 8:17, 9:2
108 [1] - 8:16
1100 [1] - 1:21
1450 [1] - 1:17
15 [1] - 1:10
150,000 [1] - 8:21

**2**

2011 [2] - 2:21, 2:24
2013 [1] - 8:17
2014 [1] - 1:10

**3**

3 [1] - 1:2
30 [2] - 2:21, 2:24
35th [1] - 1:17

**4**

488 [1] - 1:21

**6**

60 [1] - 1:9
650832/12 [1] - 1:6

**9**

904 [1] - 8:16

**A**

AARON [1] - 1:7
Aaron [1] - 2:5
able [1] - 7:3
absolutely [2] - 5:18, 8:10
according [1] - 2:12
account [12] - 2:9, 6:8, 6:12, 7:16, 9:7, 9:11, 10:6, 10:7, 10:10, 10:12, 10:13
action [1] - 10:20
actions [1] - 6:19

AD3d [1] - 8:16
additional [1] - 4:19
admitted [1] - 9:14
ADR [1] - 11:8
affidavit [2] - 3:11, 4:16
affidavits [1] - 4:9
affirmed [1] - 8:7
agree [2] - 2:9, 5:9
agreed [1] - 2:14
agreement [3] - 2:24, 3:4, 5:15
AND [1] - 11:22
APPEARANCES [1] - 1:15
appeared [4] - 9:7, 9:10, 9:23, 9:26
Appellate [2] - 8:5, 8:6
argument [3] - 8:3, 8:5, 8:8
arrangement [1] - 6:10
arrived [1] - 9:12
assume [1] - 10:19
assumes [1] - 8:13
ate [1] - 2:18
Attorney [1] - 1:20
attorney [5] - 9:14, 9:21, 10:5, 10:6, 10:12
Attorneys [1] - 1:17
authority [1] - 8:13
Avenue [1] - 1:21

**B**

bank [3] - 2:9, 7:15, 9:10
bar [1] - 9:21
based [1] - 4:13
BE [1] - 11:21
BEFORE [1] - 1:12
belonging [1] - 8:14
belongs [1] - 9:24
benefitted [1] - 7:9
between [1] - 10:10
beyond [1] - 7:7
BONNIE [1] - 11:24
Bonnie [1] - 1:24
BRANSTEN [1] - 1:13
Broadway [1] - 1:17
burden [1] - 6:9
BY [1] - 1:18

**C**

care [1] - 4:16
case [5] - 5:26, 7:25, 7:26, 8:8, 8:9
causes [1] - 10:20

Centre [1] - 1:9
CERTIFIED [1] - 11:21
cetera [2] - 9:18, 9:19
charged [1] - 3:16
City [1] - 8:16
clarify [1] - 10:14
client [1] - 7:11
close [1] - 2:23
closing [1] - 2:20
coming [1] - 3:3
comment [1] - 10:4
comprehensive [1] - 9:15
concept [1] - 3:3
conclusive [1] - 4:11
conditions [1] - 5:5
consider [1] - 4:15
contact [1] - 9:24
contract [4] - 9:8, 9:9, 10:24, 10:25
control [1] - 8:14
controlled [3] - 10:8, 10:11, 10:12
convenience [2] - 5:21, 5:22
conversion [9] - 3:16, 4:5, 7:26, 8:9, 8:12, 8:18, 10:16, 10:24, 11:14
copy [3] - 11:12, 11:13, 11:15
Corporation [1] - 10:7
correct [2] - 4:8, 10:18
CORRECT [1] - 11:22
COUNTY [1] - 1:2
course [1] - 9:4
COURT [26] - 1:2, 2:2, 2:5, 2:8, 2:12, 3:7, 3:9, 3:12, 3:20, 4:11, 5:3, 5:7, 5:16, 6:3, 6:17, 6:21, 7:6, 7:26, 10:8, 10:15, 10:19, 11:2, 11:7, 11:11, 11:18, 11:25
Court [5] - 1:24, 3:9, 3:14, 3:17, 7:21
cross [1] - 4:7
cross-motions [1] - 4:7

**D**

decide [1] - 7:3
decided [1] - 5:26
decision [1] - 8:6
defendant [1] - 2:5
Defendant [2] - 1:8, 1:20
defendant's [1] - 8:23
defense [1] - 6:18

definitely [1] - 8:21
Department [1] - 8:17
deposit [2] - 2:19, 2:24
deposition [1] - 3:25
derogation [1] - 8:24
detriment [1] - 10:3
dismiss [1] - 8:4
dispute [2] - 5:14, 10:11
distinction [1] - 10:10
Division [2] - 8:5, 8:7
document [7] - 2:13, 2:14, 6:6, 6:7, 6:16, 7:4
dominion [1] - 8:23
done [1] - 11:17
doubt [2] - 2:8, 9:6
duty [8] - 7:24, 7:26, 8:2, 8:9, 8:10, 9:5, 9:20

**E**

EILEEN [1] - 1:13
elements [1] - 8:18
equally [1] - 5:11
er [1] - 6:14
error [1] - 9:12
escrow [9] - 2:15, 2:19, 6:7, 6:8, 9:7, 9:22, 10:6, 10:10, 10:13
ESQ [2] - 1:18, 1:20
et [2] - 9:18
ethics [1] - 9:15
Etra [22] - 2:5, 2:25, 3:11, 4:20, 5:11, 5:13, 5:15, 5:16, 6:8, 6:15, 6:19, 7:3, 7:11, 7:17, 7:23, 7:24, 8:26, 9:6, 10:5, 10:11, 10:12, 10:24
ETRA [1] - 1:7
Etra's [6] - 3:23, 4:15, 5:4, 6:19, 9:10, 9:11
event [1] - 2:23
evidentiary [1] - 6:5
exercises [1] - 8:13
expert [4] - 3:21, 6:24, 7:2

**F**

fact [8] - 2:15, 3:23, 5:20, 6:4, 6:19, 6:25, 7:7, 10:23
facts [1] - 5:14
failed [1] - 2:23
fine [1] - 10:14

firm [1] - 2:3
First [1] - 8:17
first [2] - 4:6, 5:4
Floor [1] - 1:17
focus [1] - 5:26
forged [1] - 9:18
forgery [5] - 3:5, 3:10, 3:13, 3:21
form [1] - 6:26
four [1] - 10:20
frankly [1] - 7:9
friend [2] - 7:17, 10:2
fund [1] - 9:22
funds [3] - 2:20, 2:26, 3:2

**G**

Gee [4] - 3:24, 5:19, 7:15, 9:3
given [4] - 3:9, 3:14, 3:17, 4:6
grant [2] - 10:19, 11:14
Grasshoff [11] - 2:2, 2:9, 2:13, 2:26, 3:2, 4:23, 5:10, 5:11, 5:13, 6:4, 7:11
GRASSHOFF [1] - 1:4
Grasshoff's [3] - 2:17, 2:19, 10:2
gray [1] - 11:12
guess [1] - 8:7

**H**

handled [1] - 8:6
handwriting [1] - 3:21
hat [1] - 2:9
held [3] - 2:15, 4:24, 6:10
hold [2] - 2:19, 6:7
Honor [7] - 3:18, 6:15, 7:2, 10:18, 11:5, 11:10, 11:17
HONORABLE [1] - 1:13
hope [1] - 11:19
Hudson [3] - 9:5, 10:2, 10:3

**I**

I-N-D-E-V-A [1] - 2:11
identification [1] - 7:22
illegally [2] - 7:9, 7:18
immediately [1] - 2:26
indeed [3] - 3:23, 4:13, 6:3

Indeva [2] - 2:10, 10:7
INDEX [1] - 1:5
indication [1] - 7:22
inquire [1] - 7:24
instead [3] - 4:2, 4:22, 6:12
intentionally [1] - 8:13
interest [1] - 8:19
interference [1] - 8:24
interfering [1] - 8:15
investment [1] - 6:11
iota [2] - 4:19, 5:18
irrespective [2] - 5:10, 5:14
issue [4] - 5:25, 6:2, 8:10, 10:23
itself [1] - 6:26

**J**

judgment [5] - 4:7, 4:12, 10:16, 10:22, 10:26
Justice [1] - 1:14

**K**

key [1] - 8:18

**L**

law [1] - 9:14
lawyer [2] - 6:8, 6:9
lawyer's [1] - 6:8
Lax [1] - 2:3
LAX [1] - 1:16
lieu [1] - 4:12
life [1] - 9:11
LLP [1] - 1:16, 2:3
look [1] - 5:19
Lynch [2] - 8:16, 9:2

**M**

ma'am [1] - 2:7
Madison [1] - 1:21
man [1] - 3:15
mean [2] - 5:19, 5:20
member [1] - 9:21
merely [1] - 6:13
mind [1] - 6:8
minutes [3] - 11:12, 11:13, 11:15
mistake [21] - 3:26, 4:2, 4:3, 4:21, 4:22, 5:7, 7:12, 7:13, 7:15, 7:19, 9:4, 9:7, 9:8, 9:11, 9:12, 9:13, 9:17, 9:20, 9:23, 9:26

money [20] - 2:15, 3:26, 4:21, 4:22, 4:24, 5:13, 6:12, 6:14, 7:8, 7:9, 7:12, 7:15, 7:21, 9:3, 9:10, 9:17, 9:24, 9:25, 9:26, 10:5
moneys [1] - 9:7
motion [2] - 8:4
motions [1] - 4:7
move [1] - 10:22
moved [1] - 10:25
MR [20] - 2:7, 2:11, 3:6, 3:8, 3:11, 3:18, 4:6, 5:2, 5:4, 5:8, 5:25, 6:15, 6:18, 6:23, 7:20, 10:4, 10:9, 11:6, 11:9, 11:17
MS [5] - 2:4, 10:18, 10:22, 11:4, 11:10

**N**

name [1] - 9:18
named [1] - 2:10
necessary [2] - 8:10, 9:23
need [1] - 8:2
never [2] - 10:3, 10:20
nevertheless [1] - 9:20
NEVILLE [1] - 1:16
Neville [1] - 2:3
NEW [2] - 1:2, 1:2
New [8] - 1:10, 1:18, 1:21, 8:16, 9:14
NO [1] - 1:5
nothing [8] - 3:12, 5:17, 5:23, 5:24, 11:4, 11:6
number [1] - 2:20

**O**

occur [2] - 4:9, 8:11
occurs [1] - 8:12
OF [3] - 1:2, 1:2
OFFICIAL [1] - 11:25
Official [1] - 1:24
once [1] - 9:10
one [5] - 6:24, 8:8, 9:6, 10:4, 10:26
One [1] - 8:19
original [2] - 6:25, 9:17

**P**

page [1] - 8:17

papers [2] - 2:14, 4:20
PART [1] - 1:2
particular [1] - 10:26
particularly [3] - 9:20, 9:21, 9:22
party [1] - 8:12
passing [1] - 7:23
pay [1] - 2:25
payment [2] - 2:17, 2:18
people [1] - 4:8
percent [1] - 10:2
person [10] - 4:2, 4:23, 6:13, 7:8, 7:10, 7:14, 7:16, 7:17, 9:22, 9:24
person's [1] - 8:15
personal [1] - 8:14
phone [1] - 5:12
Piccirillo [1] - 1:24
PICCIRILLO [1] - 11:24
Pinzler [2] - 2:6, 3:3
PINZLER [21] - 1:20, 2:7, 2:11, 3:6, 3:8, 3:11, 3:18, 4:6, 5:2, 5:4, 5:8, 5:25, 6:15, 6:18, 6:23, 7:20, 10:4, 10:9, 11:6, 11:9, 11:17
places [1] - 3:26
Plaintiff [2] - 1:5, 1:17
plaintiff [2] - 2:2, 11:4
plaintiff's [2] - 8:19, 8:25
point [3] - 8:26, 9:2, 10:14
position [5] - 5:4, 5:9, 6:20, 7:20
possession [1] - 8:15
possessory [1] - 8:19
practice [1] - 9:14
PROCEEDINGS [1] - 1:11
produced [2] - 6:23, 6:24
profit [2] - 6:14, 7:14
profit-er [1] - 6:14
profited [1] - 7:18
profits [1] - 4:3
proof [15] - 3:9, 3:14, 3:17, 3:19, 4:11, 4:14, 4:17, 4:19, 4:20, 5:18, 5:22, 6:5, 6:21, 6:23, 9:19
property [3] - 8:14, 8:20, 8:24
prove [2] - 3:22, 5:17
provided [4] - 2:25, 4:19, 5:23, 6:5

pursuant [3] - 8:8, 9:8
puts [1] - 6:9

**Q**

quote [3] - 2:16, 2:25, 8:18

**R**

RAQUEL [1] - 1:18
Raquel [2] - 2:3, 2:4
rather [1] - 10:6
receipt [2] - 2:17
received [1] - 7:21
receiving [1] - 5:12
record [1] - 2:10
rectify [1] - 9:16
release [2] - 2:19, 2:25
relied [1] - 4:14
remains [1] - 10:5
Reporter [1] - 1:24
REPORTER [1] - 11:25
require [1] - 10:25
resolving [1] - 6:2
respond [1] - 5:2
result [1] - 4:18
return [2] - 7:16, 9:25
returned [1] - 10:3
returning [1] - 4:22
rights [1] - 8:25
rules [1] - 9:15

**S**

second [3] - 5:8, 7:7
section [1] - 2:22
seem [1] - 4:26
self [3] - 3:15, 4:17, 4:18
self-serving [3] - 3:15, 4:17, 4:18
send [6] - 2:9, 4:3, 7:13, 9:17, 9:26, 11:7
sending [2] - 4:2, 4:21
sends [3] - 4:23, 5:11, 5:13
sent [10] - 3:26, 7:8, 7:9, 7:16, 8:21, 9:3, 10:6, 11:8
September [3] - 1:10, 2:21, 2:24
serving [3] - 3:15, 4:17, 4:18
shall [4] - 2:19, 2:25, 2:26
Shapiro [1] - 7:25
sheet [1] - 11:12

sign [7] - 5:5, 5:15, 5:17, 5:18, 5:20, 5:23
signature [4] - 3:13, 3:23, 3:24, 6:26
signed [8] - 3:4, 5:22, 6:5, 6:15, 7:3, 7:4, 10:24, 10:25
signing [1] - 2:13
simple [1] - 8:12
single [1] - 11:16
someone [1] - 5:12
source [1] - 9:17
spell [1] - 2:10
standards [1] - 10:13
STATE [1] - 1:2
State [1] - 9:14
statement [5] - 3:15, 3:24, 4:16, 4:18, 7:10
Street [1] - 1:9
submit [1] - 3:18
submitted [1] - 3:11
sued [1] - 10:16
suggest [2] - 5:26, 7:25
Suite [1] - 1:21
sum [1] - 2:12
summary [5] - 4:7, 4:12, 10:16, 10:22, 10:26
support [1] - 5:23
supposed [1] - 4:24
SUPREME [1] - 1:2
SVEN [1] - 1:4

**T**

TERM [1] - 1:2
Terrigno [4] - 2:3, 2:4, 5:9, 10:15
TERRIGNO [6] - 1:18, 2:4, 10:18, 10:22, 11:4, 11:10
testimony [2] - 4:8, 4:9
THE [25] - 1:2, 2:2, 2:5, 2:8, 2:12, 3:7, 3:9, 3:12, 3:20, 4:11, 5:3, 5:7, 5:16, 6:3, 6:17, 6:21, 7:6, 7:26, 10:8, 10:15, 10:19, 11:2, 11:7, 11:11, 11:18
theory [1] - 9:11
therefore [2] - 3:25, 9:4
TO [1] - 11:21
trade [1] - 8:26
transaction [6] - 2:18,

2:20, 2:23, 4:25,
6:14, 7:18
**TRANSCRIPT** [1] -
11:22
**tray** [1] - 9:2
**TRIAL** [1] - 1:2
**trial** [4] - 4:9, 4:12,
6:25, 7:2
**true** [1] - 10:4
**TRUE** [1] - 11:21
**try** [1] - 3:22
**two** [2] - 8:18, 8:23

## U

**under** [4] - 8:26, 9:3,
9:11, 9:15
**unfortunately** [1] -
11:9
**unsuccessful** [1] -
11:9
**up** [3] - 3:3, 5:19, 8:6

## V

**versus** [1] - 8:16
**vie** [1] - 8:26
**view** [1] - 9:2

## W

**whatsoever** [2] - 4:20,
9:19
**whence** [1] - 7:23
**WILLIAM** [1] - 1:20
**William** [1] - 2:6
**wire** [1] - 3:2
**wish** [1] - 5:26
**word** [1] - 11:16
**words** [1] - 4:15
**worthy** [2] - 4:14, 4:17
**write** [1] - 11:16

## Y

**YORK** [2] - 1:2, 1:2
**York** [8] - 1:10, 1:18,
1:21, 8:16, 9:14
**yourself** [2] - 3:20,
3:21

# Exhibit B

◆ Positive
As of: December 4, 2018 5:03 PM Z

# *Grasshoff v Etra*

Supreme Court of New York, Appellate Division, First Department

January 19, 2016; January 19, 2016, Entered

650832/12, 16700, 16699

**Reporter**
135 A.D.3d 574 *; 22 N.Y.S.3d 857 **; 2016 N.Y. App. Div. LEXIS 296 ***; 2016 NY Slip Op 00304 ****

 **[****1]**  Sven Grasshoff, Respondent, v Aaron Etra, Appellant.

**Prior History:** *Grasshoff v Etra, 2013 N.Y. Misc. LEXIS 3308, 2013 NY Slip Op 31713(U) (N.Y. Sup. Ct., July 25, 2013)*

## Core Terms

funds, summary judgment, unanimously, conversion, costs

## Headnotes/Syllabus

**Headnotes**

Torts—Conversion—Transfer of Funds without Plaintiff's Permission

**Counsel:**  **[***1]** William M. Pinzler, New York, for appellant.

Lax & Neville LLP, New York (Raquel Kraus of counsel), for respondent.

**Judges:** Concur—Tom, J.P., Friedman, Saxe and Kapnick, JJ.

## Opinion

 **[*574] [**857]** Judgment, Supreme Court, New York County (Eileen Bransten, J.), entered October 30, 2014, in favor of plaintiff, in the total amount of $192,895.60, pursuant to an order, same court and Justice, which, to the extent appealed from, granted plaintiff's motion for summary judgment on his conversion cause of action, unanimously affirmed, without costs. Appeal from aforesaid order, unanimously dismissed, without costs, as subsumed in the appeal from the judgment.

Plaintiff established his prima facie entitlement to summary judgment on his conversion claim by submitting deposition testimony, financial transfer documents and correspondences **[*575]** showing that he transferred his personal funds into an apparent escrow account maintained by defendant, that defendant intentionally retransferred those funds to a different individual without plaintiff's permission, and that the transfer effectively deprived plaintiff of the funds, which were never recovered (*see State of New York v Seventh Regiment Fund, 98 NY2d 249, 259-260, 774 NE2d 702, 746 NYS2d 637 [2002]; Colavito v New York Organ Donor Network, Inc., 8 NY3d 43, 49-50, 860 NE2d 713, 827 NYS2d 96 [2006]*). In opposition, defendant failed to raise a triable issue of fact.

We have considered defendant's **[***2]** remaining arguments and find them unavailing. Concur—Tom, J.P., Friedman, Saxe and Kapnick, JJ.

---

**End of Document**